**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **HI-VAC CORPORATION** | ) | |
| 117 Industry Road | ) | |
| Marietta, Ohio 45750 | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **ALLIANCE INDUSTRIES, INC.,** | ) | |
| Reno Business Park | ) | |
| 27811 State Route 7 | ) | |
| Marietta, Ohio 45750 | ) | |
| | ) | **Case No. _____** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DANIEL J. COLEY,** | ) | |
| 3256 Aleah Court | ) | |
| Cuyahoga Falls, Ohio 44223 | ) | |
| | ) | |
| **MATTHEW D. GREENWOLD,** | ) | |
| 3108 Hunter Road | ) | |
| Brighton, Michigan 47114 | ) | |
| | ) | |
| **RANDY J. DEPUY,** | ) | |
| 45847 Cobb Road | ) | |
| Caldwell, Ohio 43724 | ) | |
| | ) | |
| **BRIAN D. GENSLER,** | ) | |
| 3111 Creekside Drive | ) | |
| Ponder, Texas 76259 | ) | |
| | ) | |
| **LINDSAY N. LIPSCOMB,** | ) | |
| 69656 State Route 124 | ) | |
| Reedsville, Ohio 45772 | ) | |
| | ) | |
| **CURTIS R. COLEY,** | ) | |
| 2673 Oak Park Boulevard | ) | |
| Cuyahoga Falls, Ohio 44221 | ) | |
| | ) | |

1

**KARL M. DICKINSON,**      )
1358 Cedar Creek Court      )
Painesville, Ohio 44077      )
                )
**G6 ENVIRONMENTAL EQUIPMENT, LLC,** )
4843 Crooked Stick Ct.      )
Brighton, Michigan 48116     )
                )
**and**              )
                )
**L-GEN SERVICES,**      )
3111 Creekside Drive      )
Lindsay, Texas 76250      )
                )
       **Defendants.**   )
                )

## Nature of the Case

1.  This is a case where a secret coalition of employees and former employees conspired to defraud, steal from, and disregard their obligations to Hi-Vac Corporation ("Hi-Vac") and its parent company, Alliance Industries, Inc. ("Alliance"). Astonishingly, the scheme was orchestrated by the then President of Hi-Vac.

2.  Daniel J. Coley ("Dan Coley"), while serving as President of Hi-Vac, masterminded a scheme carried out by a team of then-current and former Hi-Vac employees and affiliated parties to subvert Hi-Vac's growth and reputation for their own personal benefit through theft, fraud, disregard of their duties to Hi-Vac, and circumvention of company policies and controls.

3.  Prior to working at Hi-Vac, four of the Defendants, Dan Coley, Matt Greenwold, Curtis Coley, and Karl Dickinson, worked together at Jack Doheny Companies. Similar to Hi-Vac, Jack Doheny Companies is engaged in the sale and service of trucks and equipment used in municipal, industrial, and environmental cleaning, and vacuum excavation applications. On

information and belief, Dan Coley, and Brian D. Gensler also knew each other through commercial interactions in the industry.

4.      Dan Coley sat at the center of a conspiratorial web that involved no less than nine Hi-Vac employees, former employees, and affiliates of these employees—particularly the Defendants in this case. From his trusted position as President of Hi-Vac, he recruited and conspired with useful helpers to exploit Hi-Vac's cash, reputation, and other resources through fraudulent and improper transactions to personally benefit, to benefit friends and family, and to compete with and disparage Hi-Vac and Alliance.

5.      As if that were not enough, prior to Dan Coley's termination from Hi-Vac, he had begun individually engaging in personal business opportunities involving suppliers, competitors, and potential business partners of Hi-Vac and Alliance's affiliate, Terra Sonic International, LLC.

6.      Through the above actions, as discussed further below, Dan Coley and his co-conspirators have completely disregarded the respective duties he and his co-conspirator employees owed to Hi-Vac, breached their contractual obligations to Hi-Vac, defrauded Hi-Vac, stole from Hi-Vac, and actively attempted to cover up their misconduct. As a result, Hi-Vac has suffered extensive damages, lost out on valuable business opportunities and profits that Dan Coley and his cohorts usurped, and suffered a massive blow to its financial returns and reputation from their misconduct.

## Parties

7.      Alliance is an Ohio corporation with its principal place of business at Reno Business Park, 27811 State Route 7, Marietta, Ohio 45750.

8.      Hi-Vac is a wholly owned subsidiary of Alliance. It is an Ohio corporation with its principal place of business at 117 Industry Road, Marietta, Ohio 45750.

3

9.      Dan Coley is an individual who, upon information and belief, resides at 3256 Aleah Court, Cuyahoga Falls, Ohio 44223. From April 1, 2015, until April 25, 2022, Dan Coley was the President of Hi-Vac and reported directly to Rudolph John Lehman—the owner, founder, President, and Chief Executive Officer of Alliance.

10.     Matthew D. Greenwold ("Greenwold") is an individual who, upon information and belief, resides at 3108 Hunter Road, Brighton, Michigan 47114. From January 2, 2018, until April 25, 2022, Greenwold was the Vice President of Business Development at Hi-Vac.

11.     Randy J. DePuy ("DePuy") is an individual who, upon information and belief, resides at 45847 Cobb Road, Caldwell, Ohio 43724. From February 29, 2016, until April 25, 2022, DePuy was the Controller of Hi-Vac.

12.     Brian D. Gensler ("Gensler") is an individual who, upon information and belief, resides at 3111 Creekside Drive, Ponder, Texas 76259. From September 25, 2017, until September 9, 2020, Gensler was employed by Hi-Vac as its Southwest Regional Sales Manager.

13.     Lindsay N. Lipscomb ("Lipscomb") is an individual who, upon information and belief, resides at 69656 State Route 124, Reedsville, Ohio 45772. From October 9, 2017, until April 25, 2022, Lipscomb was an accountant for Hi-Vac reporting directly to DePuy.

14.     Curtis R. Coley ("Curtis Coley"), Dan Coley's brother, is an individual who, upon information and belief, resides at 2673 Oak Park Boulevard, Cuyahoga Falls, Ohio 44221. From January 20, 2020, until April 25, 2022, Curtis Coley was the Director of Commercial Sales for Hi-Vac.

15.     Karl M. Dickinson ("Dickinson") is an individual who, upon information and belief, resides at 1358 Cedar Creek Court, Painesville, Ohio 44077. From February 11, 2019, until March 27, 2020, Dickinson was the Ohio Director of Business Development/Truck Trailer

4

Products for Hi-Vac. From June 1, 2020, until May 31, 2022, Dickinson was the Ohio Operations Manager/Sales for Hi-Vac.

16. G6 Environmental Equipment, LLC ("G6"), at all times relevant to these proceedings, was a Michigan limited liability company with a principal place of business at 4843 Crooked Stick Ct., Brighton, Michigan 48116.

17. L-GEN Services ("L-GEN") is an unincorporated business formed by Gensler and his wife, Loretta Hughes-Gensler with a principal place of business in 3111 Creekside Drive, Lindsay, Texas 76250.

## Jurisdiction and Venue

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, raise a federal question.

19. This Court has supplemental jurisdiction over the Plaintiffs' state-law claims under 28 U.S.C. § 1367 because those claims are so related to the RICO and DTSA claims as to form part of the same case or controversy.

20. This Court has personal jurisdiction over all Defendants under R.C. § 2307.382 because the causes of action alleged in this Complaint arise out of each Defendant transacting business in Ohio, contracting to supply services or goods in this state, causing tortious injury by an act or omission in this state, and because the Defendants regularly do or solicit business or engage in a persistent course of conduct or deriving substantial revenue from goods used or consumed or services rendered in this state. Defendants have purposefully directed their actions

towards Ohio and/or have the requisite minimum contacts with Ohio to satisfy any statutory or constitutional requirements for personal jurisdiction.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of Ohio. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants reside, are found, have agents, or transact their affairs in this district.

**Hi-Vac Corporation Background**

22.     Alliance is the parent company of Hi-Vac.

23.     Hi-Vac is in the business of manufacturing, selling, and servicing vacuum trucks and ancillary equipment used in the municipal, industrial, environmental cleaning, and vacuum excavation industries. Markets for Hi-Vac's vacuum trucks include municipalities and specialty contractors involved in sewer cleaning, hydro excavation, and industrial vacuum applications.

24.     At all times relevant to this action, Dan Coley served as President of Hi-Vac.

25.     Greenwold served as the Vice President of Business Development for Hi-Vac and reported directly to Dan Coley.

26.     DePuy served as the Controller for Hi-Vac, overseeing all accounting for the company. He reported directly to Dan Coley.

27.     Lipscomb served as an accountant for Hi-Vac and reported directly to DePuy. Lipscomb's responsibilities included accounts payable, expense reimbursement and other cash transactions and controls for Hi-Vac.

28.     Dan Coley, Greenwold, DePuy, Lipscomb, Gensler, and Dickinson had access to Plaintiff's computer systems and computer networks as part of their employment at Hi-Vac.

**Discovery of Conspiracy**

29.     On March 23, 2022, Lipscomb began maternity leave. In her absence, Dani Brooker, née Drayer, a second, more junior accountant in the Hi-Vac accounting department, took over Lipscomb's responsibilities for accounts payable, expense reimbursements, and other cash transactions and controls. Ms. Brooker also reported directly to DePuy. Soon after taking over, Ms. Brooker identified several questionable transactions in the accounting records.

30.     Ms. Brooker met with Alliance Chief Executive Officer Rudolph John Lehman on March 25, 2022, to discuss what she had discovered.

31.     Following this meeting Hi-Vac and Alliance began their investigations into these improprieties and alerted law enforcement.

32.      Over the course of March through May 2022, Hi-Vac and Alliance conducted their own internal investigations and cooperated with law enforcement to investigate what slowly began to be unraveled as a conspiracy headed by Dan Coley to defraud, steal from, and otherwise take advantage of Plaintiffs. This conspiracy spanned several fronts of Hi-Vac's business and is discussed in greater detail below.

33.     Dan Coley, while serving in a position of trust and authority as Hi-Vac's President, acted as the head of various schemes to exploit Hi-Vac's money, reputation, and resources for the personal benefit of himself as well as his co-conspirators and their family members.

34.     DePuy abused his position as Controller—which should have made him the financial gatekeeper for Hi-Vac—to assist Dan Coley and his other compatriots in by-passing Hi-Vac's policies and controls to exploit Hi-Vac's resources for their own personal benefit.

35.     Gensler, Curtis Coley, Lipscomb, and Greenwold bought in wholeheartedly to Dan Coley's schemes. Each enthusiastically participated in pillaging Hi-Vac for their own benefit and disregarded their employment and contractual duties to Hi-Vac and Alliance.

36.     It was not until early May 2022 that Hi-Vac began to fully understand the depth of Dan Coley's conspiracy, the severe losses involved, the complex nature of the misconduct, and the extent of the participation of the Defendants.

37.     The complex nature of the misconduct coupled with the Defendants' efforts to cover their tracks constitute extraordinary circumstances that prevented earlier discovery by Alliance and Hi-Vac. Based on information learned by Alliance and Hi-Vac over the course of their investigations into late April 2022, Dan Coley, together with Greenwold, DePuy, Curtis Coley, and Lipscomb were terminated on April 25, 2022, and Dickinson was terminated on May 31, 2022 (Dan Coley, Greenwold, DePuy, Curtis Coley, and Lipscomb, together with Gensler, are collectively referred to as "Conspirators").

38.     At all times relevant to these proceedings, Hi-Vac and Alliance exercised reasonable diligence in their oversight of the Conspirators. All of the Conspirators were trusted, relied upon, and expected to devote their professional efforts to support Hi-Vac's growth, reputation, and financial returns. Unfortunately, that trust was misplaced.

39.     Given the senior leadership roles of several of the Conspirators within the Hi-Vac organization, the trust given to the Conspirators, as well as their efforts to cover up their misconduct, it was not reasonable for Plaintiffs to be alerted as to the nature and extent of injuries caused by the Defendants' tortious activities until Ms. Brooker reported what she had discovered while filling in for Lipscomb and the subsequent investigations by Alliance, Hi-Vac, and law enforcement began to shed a clear light on the intricacies of the conspiracy and the web of misconduct, and the impact of this conduct on Hi-Vac and Alliance.

40.     As described more fully below, Defendants wrongfully concealed their tortious activities from the ownership of Alliance and Hi-Vac by exploiting their knowledge of Hi-Vac

policies, controls, and confidential information such as customer lists, customer contacts, and customer business practices, to make it so their misconduct would not be discovered without focused investigation.

41.     Additionally, the conduct of Defendants constitutes continuing violations occurring over many years up until the dates of termination in or about April and May of 2022. Their tortious scheme continuously caused injury to the Plaintiffs, and had the scheme ceased at any earlier date, further injury would have been avoided.

42.     Defendants knowingly gained access to, attempted to gain access to, or caused access to be gained to Plaintiff's computers, computer systems, computer networks, cable service, cable system, telecommunications devices, telecommunications services, or information services without the consent of, or beyond the scope of the express or implied consent of, Plaintiff, as the owner of the computers, computer systems, computer networks, cable service, cable systems, telecommunications devices, telecommunications services, or information service or other person authorized to give consent while engaging in their tortious activities described throughout this Complaint.

**The G6 Environmental Equipment Transactions**

43.     Greenwold, with the participation of mastermind Dan Coley, perpetuated a scheme to defraud Hi-Vac to line his own pockets by arranging for equipment sales by Hi-Vac to his own company—G6—at heavily discounted prices, ignoring Hi-Vac sales policies, and reselling them to purchasers (that otherwise would have been Hi-Vac customers) at a substantial mark-up in competition with Hi-Vac.

44.     On or about early January, 2018, Greenwold was hired by Dan Coley to serve as Hi-Vac's Vice President of Business Development, with responsibility for sales.

45.     On May 16, 2018, unbeknownst to Plaintiffs, Greenwold incorporated G6 as a competing company to Hi-Vac.

46.     The Articles of Incorporation for G6 list the street address of the registered office as 4843 Crooked Stick Ct., Brighton, Michigan, or Greenwold's former home address.

47.     Greenwold is listed as the Resident Agent at G6's registered office, and is the only identified individual associated with this company other than the company attorney.

48.     G6 sold competing vacuum truck products to the same end-user customer base as Hi-Vac.

49.     G6's Articles of Organization list its corporate purpose as "sales of new and used combination sewer cleaners, hydro-excavators, industrial air movers, & wet vacs"—which are the same as Hi-Vac's business.

50.     On October 26, 2018, Greenwold listed G6 as a "direct sales" customer in the Hi-Vac records.

51.     Hi-Vac had a policy requiring a mandatory credit application on file prior to customer orders being processed.

52.     Hi-Vac did not have a credit application on file for G6.

53.     An email requesting the credit application was sent to Mr. Depuy, President Dan Coley and accounts receivable at Hi-Vac.

54.     An email response stated, "message from Matt Greenwold…Dan waived the credit app as it is financing for an end user."

55.     Greenwold, through the participation of Dan Coley, arranged for Hi-Vac to sell its products to G6—Greenwold's own company—at substantially discounted selling prices.

56. Greenwold acted as a salesman for Hi-Vac and submitted orders and invoices for equipment which were sold to G6 at "dealer net," or a price which was significantly reduced from the "list price" at which the Hi-Vac Equipment should have been sold to G6.

57. The trucks were sold to G6 at a price which should have only been available to legitimate, authorized Hi-Vac dealers/distributors.

58. Hi-Vac's sales policies include dealer/distributor pricing, as well as standard list pricing for non-dealer/distributors. G6 was not an authorized dealer/distributor.

59. As a non-dealer/distributor, sales to G6 (if authorized at all) should have been at or about the standard list pricing for the trucks.

60. However, G6 resold these heavily discounted trucks, in competition with Hi-Vac, to end-users with a substantial mark-up by G6.

61. The benefit of these transactions accrued directly to G6 and Greenwold and eventually to Dan Coley and other Conspirators.

62. By selling to G6, his own company, these trucks at the dealer/distributor price, Greenwold caused Hi-Vac to incur the following losses:

| Description | List Price | Price to G6 | Loss |
|---|---|---|---|
| Sales Order #22773 for XV-5810 | $506,500 | $434,840 | $71,660 |
| Sales Order #24787 for XV-5844 | $479,289 | $407,117 | $72,172 |
| Sales Order #24812 for XV-5883 | $445,922 | $380,104 | $65,818 |
| Total | $1,431,711 | $1,222,061 | $209,650 |

63. Order # 22773 was for an X-13 Hydro Excavator with add-ons.

64. Order # 24787 was for an X-8 (Demo) Hydro Excavator with add-ons.

65.     Order # 24812 was for an X-8 Hydro Excavator with add-ons.

66.     In addition to the improper discounts on standard list pricing for these trucks sold to G6, Dan Coley and Greenwold arranged for the additional improper discounts and expense waivers related to those sales :

| Sales Order # | Description | Loss |
|---|---|---|
| 22773 | Scale added to equipment at no cost to G6 | $5,600 |
| 22773 | Steel Surcharge waived by Coley | $4,101 |
| 24787 | Additional discount authorized by Coley | $6,500 |
| 24787 | Freight charge waived by Coley | $2,000 |
| 24812 | Freight Charge waived by Coley | $1,639 |
| | Total | $19,840 |

67.     Including the unauthorized price reductions and other discounts summarized above, Hi-Vac's total losses from these three sales of new trucks to G6 are $229,490.14.

68.     Additionally, Hi-Vac paid unauthorized commissions of $5,491 to Greenwold and reimbursed $1,321 of fraudulent expenses submitted by Dan Coley.

69.     Dan Coley executed an employment agreement with Hi-Vac ("Dan Coley Agreement") on April 17, 2015, which he violated through the above misconduct. Dan Coley's employment agreement is attached hereto as Exhibit A.

70.     The Dan Coley Agreement provides, in pertinent part:

[Dan Coley] agrees at all times during the term of [his] employment with Company[1] and thereafter to hold in strictest confidence, and not to use, except for the benefit of Company . . . any Confidential Information of Company." (Ex. A, Addendum D).

***

---

[1] This term is defined to include "Hi-Vac . . . and its current and future subsidiaries, affiliates, successors and assigns." (Ex. A, Addendum D).

> [Dan Coley] shall not, directly or indirectly, for [Dan Coley] or on behalf of or in conjunction with any other person, company, partnership, corporation, limited liability company, business, group, or other entity: (i) engage or participate directly or indirectly as an employee, agent, proprietor, partner, lender, consultant, advisor or officer anywhere in the Territory,[2] or have any ownership interest in, or participate in the financing, management or control of any firm, partnership, corporation, limited liability company, entity or other business that engages or participates in the Territory in business activity which is directly competitive with any of the lines of business of Company. (*Id.*).

By exploiting Hi-Vac's confidential price lists for his own benefit and assisting Greenwold in competing with Hi-Vac, Dan Coley breached, at the very least, these provisions of the Dan Coley Agreement.

71.     Greenwold executed a Confidentiality and Non-Competition Agreement with Alliance ("Greenwold Agreement") on April 25, 2019, which he violated through the above misconduct. Greenwold's Confidentiality and Non-Competition Agreement is attached hereto as Exhibit B.

72.     Greenwold's Confidentiality and Non-Competition Agreement provides, in pertinent part:

> "[Greenwold] shall keep confidential and shall not directly or indirectly use . . . without Company's[3] specific, prior written consent . . . any information concerning Company's business that is maintained as confidential or should be reasonably considered by [Greenwold] as confidential information of Company and/or business information that Company does not make public, and any of Company's trade secrets." (Ex. B, p. 1).
>
> ***
>
> "[Greenwold] . . . will not engage in any other employment or business activity while employed by the Company that might interfere with [Greenwold's] full-time performance of [Greenwold's] duties for the Company or cause a conflict of interest." (Ex. B, p. 3)

---

[2] This term is defined to include "(i) each county in the state of Ohio; (ii) each state in the United States; or (iii) anywhere in the world outside the United States . . . where [Hi-Vac] conducts business." (Ex. A, Addendum D).
[3] This term is defined to include "Alliance Industries, Inc. . . . along with any of its Affiliates, and includes any successors and assigns and any such related entities." (Ex. B, p. 1).

By exploiting Hi-Vac's confidential price lists for his own benefit and competing with Hi-Vac through G6, Greenwold breached, at the very least, these provisions of the agreement.

**City of Stow Truck Trade-In**

73. Dan Coley, DePuy, and Greenwold further participated in a scheme to usurp a business opportunity from Hi-Vac by arranging for the sale by Hi-Vac to G6 at cost of a truck taken in by Hi-Vac on a trade-in, and the subsequent resale of that traded-in truck by G6 for a significant profit.

74. Upon information and belief, Dickinson also participated in this scheme.

75. In or about the first quarter of 2020, the city of Stow, Ohio purchased a truck from Hi-Vac. As part of this transaction, Stow traded-in a truck for a credit of $35,000 against the cost of the new vehicle.

76. Greenwold coordinated this nefarious transaction, with support from DePuy and Dickinson. G6, Greenwold's company, purchased the traded-in truck from Hi-Vac for $35,000—the same amount as the credit given to Stow on the purchase of its new vehicle.

77. On May 26, 2020, G6 then resold the traded-in truck to its own end-user customer, Waid Corp. for $80,000; realizing a substantial profit of $45,000 that otherwise would have been Hi-Vac's.

78. DePuy facilitated this transaction in his role as Controller for Hi-Vac. He applied a $35,000 credit to the purchase price of the truck sold to Stow and directed that a purchase order be obtained from G6 for the traded-in truck that was purchased by G6 from Hi-Vac at cost.

79. As a result, Hi-Vac, through the efforts of Greenwold, Depuy and Dickinson, not only applied a $35,000 credit to Stow's order for its new truck, but lost out on the opportunity to both recoup that cost and make a profit on the resale of the trade-in. Resales of trade-ins represent

a significant profit opportunity for Hi-Vac. That profit is, of course, not available if trade-ins are resold at cost.

80.     DePuy executed a Confidentiality, Non-Competition, Non-Solicitation, and Assignment of Proprietary Rights Agreement with Hi-Vac ("DePuy Agreement") on February 25, 2016, which he breached by engaging in the above misconduct. The DePuy Agreement is attached hereto as Exhibit C.

81.     The DePuy Agreement provides, in pertinent part:

[DePuy] shall keep confidential and shall not directly or indirectly use . . . without Company's[4] specific, prior written consent . . . any information concerning the Company's and/or its affiliates' business or affairs, any trade secrets . . . , and/or data heretofore or hereafter learned, acquired, or coming to your knowledge in connection with [DePuy's] employment with the Company, regardless of the format thereof. (Ex. C, p. 1)

***

[DePuy agrees] that during the term of [his] employment with Company . . . [DePuy] will not, directly or indirectly, whether as an employee, employer, contractor, consultant, agent, principal, partner, trustee, stockholder, corporate officer, director, investor, or in any other individual or representative capacity, and whether for your own or another's benefit: (a) Engage in or participate in any business that is in competition, in any manner whatsoever with Alliance Industries' business within a fifty (50) mile radius of any geographic area in which [DePuy was] assigned or provided services for on behalf of the Company, or give any advice or assistance to any such competitor (*Id.*)

By utilizing Hi-Vac's confidential information for his own benefit and assisting Greenwold in competing with Hi-Vac through his company, G6, DePuy breached, at the very least, these provisions of the DePuy Agreement.

82.     Greenwold's participation in this scheme breached not only his fiduciary duties to his employer Hi-Vac, including but not limited to, a duty of care, a duty of loyalty and a duty to act in the best interest of his employer, but also the Greenwold Agreement through utilizing Hi-

---

[4] As used in the DePuy Agreement, "Company" means "Alliance Industries, Inc. . . . along with any of its subsidiaries or affiliated entities, and includes successors and assigns and any such related entities." (Ex. C, p. 1).

Vac's confidential information for his own benefit, competing with Hi-Vac through his company, G6, and diverting profit on a trade-in that should have accrued to Hi-Vac.

83.     Coley's participation in this scheme breached not only his fiduciary duties to his employer Hi-Vac, including but not limited to, a duty of care, a duty of loyalty and a duty to act in the best interest of his employer, but also the Dan Coley Agreement through utilizing Hi-Vac's confidential information for his own benefit and assisting Greenwold in competing with Hi-Vac through his company, G6, and diverting profit on a trade-in that should have accrued to Hi-Vac.

84.     Dickinson executed a Confidentiality, Non-Competition, Non-Solicitation, and Assignment of Proprietary Rights Agreement with Hi-Vac ("Dickinson Agreement") on June 1, 2020.  The Dickinson Agreement is attached hereto as Exhibit D.  Dickinson's participation in this scheme breached not only his fiduciary duties to his employer Hi-Vac, including but not limited to, a duty of care, a duty of loyalty and a duty to act in the best interest of his employer, but also the Dickinson Agreement through utilizing Hi-Vac's confidential information for his own benefit and assisting Greenwold in competing with Hi-Vac through his company, G6, and diverting profit on a trade-in that should have accrued to Hi-Vac.

## Unauthorized Expenses

85.     Dan Coley, Gensler, DePuy, and Lipscomb used Hi-Vac as their personal piggy bank, directing funds to purposes that they knew were not authorized and would not be authorized if their true purpose was apparent to Hi-Vac and Alliance.

**Fraudulent Checks to Gensler and L-Gen Services**

86.     On or about March 21, 2022, prior to Lipscomb leaving on maternity leave, Ms. Brooker noticed a few checks clear the company account of which Hi-Vac had no knowledge. These checks were not accounted for in the company's "outstanding checks list."

87.     One of these checks was issued on March 7, 2022, to L-GEN Services with the address of P.O. Box 506 Lindsay, Texas for $11,000.

88.     The $11,000 check was purportedly supported by two check requests:

- A February 17, 2022, request for a $5,500 expense documented as services paid for "customer entertainment."
- A March 7, 2022, request for a $5,500 expense documented as services paid for "customer entertainment."

89.     Despite this check being unsubstantiated and fraudulent, Dan Coley approved this check, Lipscomb issued it, DePuy signed it, and Gensler endorsed and deposited it.

90.     Alliance has an "Employee Manual for Administrative Policies and Procedures" ("Manual") which Dan Coley, Lipscomb, DePuy, and Gensler violated by participating in the above scheme regarding the fraudulent check.

91.     Pursuant to the Manual:

a. Entertainment – Employees must be expressly authorized by their supervisor to incur entertainment expenses. Entertainment expenditures of $100 or greater require a short justification (client, event, etc.) on the BER. (Manual at 28 ¶ c).

b. Meals or entertainment associated with any informal gathering of employees not directly related to the active conduct of the Company's business are not considered business meals or entertainment and will not be reimbursed by the Company.  (*Id*. at 31 ¶ D1).

c. Any business expenditure which is "lavish or extravagant" is considered to be unreasonable and unnecessary and will not be reimbursed by the Company.  (*Id.* at 31 ¶ D2).

**Texas Hunting Camp**

92.     Dan Coley, DePuy, Gensler and Lipscomb conspired to misappropriate Hi-Vac funds for a hunting retreat in Texas with full knowledge that the hunting retreat was not an approved Hi-Vac expense.

93.     In or about April 2019, Dan Coley and Gensler presented a proposal to Alliance senior management to lease land in Texas to use as a hunting camp to entertain current and prospective clients.

94.     The cost of the lease was $16,800 for June 1, 2019, through June 1, 2020.

95.     Rudolph John Lehman, the founder, owner, President, and Chief Executive Officer of Alliance, emphatically refused to authorize the Texas hunting camp in April 2019, merely ten minutes after being made aware of Dan Coley and Gensler's plan to open a hunting camp. It wasn't until Ms. Brooker's meeting with Mr. Lehman in March 2022 and the investigations that followed that Mr. Lehman, Alliance, and Hi-Vac learned that these explicit instructions were ignored and that Dan Coley, DePuy, Gensler, and Lipscomb proceeded to lease the hunting camp property and set up and run the secret hunting camp without authorization.

96.     To fund this camp and further benefit themselves, Dan Coley, DePuy, Gensler, and Lipscomb used Hi-Vac funds obtained through a series of unauthorized checks paid to Gensler and L-Gen over the course of 2019 and 2020. In total, Gensler and L-Gen received at least $150,896 in unauthorized and improper payments, comprised of the $11,000 of fraudulent payments described above at Paragraphs 86-91, and additional fraudulent payments in the amount of $139,896 described below at Paragraphs 97-109.

**Fraudulent Payments to Gensler Facilitated Through Use of a Fictitious Account**

97. Dan Coley, Gensler, Lipscomb, and DePuy exploited their knowledge of Hi-Vac's internal controls and confidential customer lists and information in order to issue the fraudulent payments described above at Paragraphs 86-91 and another $139,896 in additional fraudulent payments to Gensler by funneling those additional payments through a fictitious Hi-Vac vendor account.

98. From May 30, 2019 through August 31, 2020, Hi-Vac issued several checks that were initially entered into the accounts payable system by Lipscomb and DePuy as payables to a fictitious account. The fictitious account was set up to look like an account related to payables owing to a legitimate Hi-Vac customer account using confidential information in the Hi-Vac customer and vendor records. Lipscomb and DePuy simply added "- Commission Only" to the name of a legitimate customer to create the fictitious account.

99. Under the cover of this fictitious account, check requests were fraudulently entered into the Hi-Vac payables system for $139,896 in fraudulent payments to Gensler, purportedly for commissions, and expense reimbursements. DePuy and Lipscomb, seemingly not content with simply using a fictitious vendor, overwrote the name of the fictitious account with that of Gensler and wrote checks to the account for Gensler in the aggregate amount of $135,000 for fake commissions and $4,896 for fraudulent expense reimbursement. The checks paid to Gensler ("Gensler Checks") were not connected in any way to commissions or any other legitimate payment to Gensler, were not properly authorized, were not for legitimate business purposes and did not represent moneys properly owing by Hi-Vac to Gensler. The Gensler Checks were comprised of Check Number 101406 dated May 21, 2019, in the amount of $25,000; Check Number 101539 dated May 30, 2019, in the amount of $20,000; Check Number 102009 dated June 27, 2019, in the amount of $20,000; Check Number 103997 dated October 23, 2019, in the amount

of \$5,000; Check Number 105579 dated February 10, 2020, in the amount of \$5,000; Check Number 106356 dated April 3, 2020, in the amount of \$20,000; Check Number 107009 dated May 21, 2020, in the amount of \$25,000; and Check Number 107931 dated August 13, 2020, in the amount of \$15,000.

100.     In addition to the \$135,000 in fake commission payments, Dan Coley and his compatriots used the Gensler Checks to pay Gensler for improper expenses that would not have been allowed if they had been submitted and processed via proper means. These expenses included \$4,500 for use of Gensler's personal vehicle and \$395.54 for a firearm Gensler purchased. These expenses were unsubstantiated and fraudulent.

101.     The Gensler Checks were produced by Lipscomb and signed by DePuy. Some of these checks were approved by Dan Coley.

102.     Dan Coley, Gensler, Lipscomb, and DePuy utilized a fictitious account, creatively disguised as a payable account related to a legitimate Hi-Vac customer, to hide these fraudulent transactions.

103.     These actions violated Hi-Vac's policies and controls. Pursuant to the Manual, a check request must never be used for personal or nonbusiness expenses, (*Id*. at 19 ¶ F1) and the proper Vendor name must be listed for each check request.  (*Id*. at 18 ¶ D1).

104.     Lipscomb executed a Confidentiality, Non-Competition, Non-Solicitation and Assignment of Proprietary Rights Agreement with Hi-Vac ("Lipscomb Agreement") on October 9, 2017, which she breached by engaging in the above misconduct. The Lipscomb Agreement is attached hereto as Exhibit E.

105.     The Lipscomb Agreement provides in pertinent part:

> [Lipscomb] shall keep confidential and shall not directly or indirectly use . . . without Company's[5] specific, prior written consent . . . any information concerning the Company's business that is maintained as confidential or should reasonably be considered by [Lipscomb] as confidential information of the Company and/or business information that the Company does not make public, and any of the Company's trade secrets. (Ex. E, p. 1)

By utilizing her knowledge of Hi-Vac customer accounts to cover up fraudulent payments to Gensler, Lipscomb, at the very least, violated this provision of the Lipscomb Agreement.

106.   Gensler executed a Confidentiality, Non-Competition, Non-Solicitation and Assignment of Proprietary Rights Agreement with Hi-Vac ("Gensler Agreement") on September 18, 2017, which he breached by engaging in the above misconduct. The Gensler Agreement is attached hereto as Exhibit F.

107.   The Gensler Agreement provides in pertinent part:

> [Gensler] shall keep confidential and shall not directly or indirectly use . . . without Company's[6] specific, prior written consent . . . any information concerning the Company's business that is maintained as confidential or should reasonably be considered by [Gensler] as confidential information of the Company and/or business information that the Company does not make public, and any of the Company's trade secrets. (Ex. F, p. 1)

By assisting in utilizing confidential information regarding Customer Accounts to cover up fraudulent payments, Gensler violated, at the very least, this provision of the Gensler Agreement.

108.   Dan Coley's participation in this scheme breached the Dan Coley Agreement by assisting in utilizing Hi-Vac's confidential information regarding customer accounts to cover up fraudulent payments.

---

[5] This term is defined to include "Hi-Vac Corporation . . . along with any of its Affiliates, and includes any successors and assigns and any such related entities." (Ex. E, p. 1).
[6] This term is defined to include "Hi-Vac Corporation . . . along with any of its Affiliates, and includes any successors and assigns and any such related entities." (Ex. F, p. 1).

109.    DePuy's participation in this scheme breached the DePuy Agreement by assisting in utilizing Hi-Vac's confidential information regarding customer accounts to cover up fraudulent payments.

**Unauthorized Use of Company Credit Cards**

110.    Hi-Vac had an Accounting Department credit card ("Accounting Card") that was intended to be physically located at the company and used to purchase items in the ordinary course of business such as IT-related subscriptions. However, DePuy began carrying the Accounting Card on his person and using it for other purposes, including frequent staff lunches, travel and other expenditures for him and a family member in Texas related to the hunting camp.

111.    Because these expenses were charged to the Accounting Card that only DePuy and Lipscomb reviewed rather than submitted for reimbursement through Hi-Vac's expense reporting system, the expenses charged to the card were not reviewed as they typically would have been. DePuy was thus able to make charges that would otherwise have been disallowed if they were submitted as reimbursements.

112.    Alliance reviewed the charges to the Accounting Card during the period from March 19, 2020, to March 31, 2022, and identified $8,674 in unauthorized expenses with no business purposes and $5,922 in expenses with an unclear business purpose.

113.    The transactions for this card include:

- Several airline flights to Texas in DePuy's name
- Hotels, rental vehicles, fuel, and toll charges in Texas
- Charges for purchases at Sam's Club, Academy Sport, Bass Pro Shop in Texas
- Charges for TRI County Electric and the City of Megargel, Texas (utilities).

114.    DePuy's credit card use and reporting violates Alliance's Credit Card policies stated in its Manual.   (Manual at 14-15).

115.    Additionally, Lipscomb ordered a credit card designated the "Sales Dept 2" card and issued it to Gensler when he was no longer a Hi-Vac employee.

116.    Lipscomb advised Ms. Brooker, before she went on maternity leave, to go directly to DePuy if there were any concerns with the Sales Dept 2 card.

117.    Sales Dept 2 had $9,300 worth of charges from December 9, 2020, through November 11, 2021. Transactions on the card include:

- Charges for ATMOS Energy in Texas for gas service (utility) for address: 423 State Highway 114, Megargel, TX
- The City of Megargel, Texas for water service (utility) for address: 423 State Highway 114, Megargel, TX
- Direct TV charges for Brian Gensler's home address
- Utility Services through RTI County Electric in Texas
- Tractor Supply in Texas for fencing

118.    Each of these charges was entirely improper and would not have been allowed if their true nature was apparent to Hi-Vac.

**<u>Fraudulent Payments to Employees and Contractors</u>**

119.    Dan Coley, DePuy, and Greenwold regularly and systematically caused payments to be issued to employees and contractors for work that was never performed.

**Fraudulent Payments to Lipscomb**

120.     Lipscomb took Family and Medical Leave Act and short-term disability leave beginning on March 23, 2022, which continued through the date of her termination on April 25, 2022.

121.     Prior to Lipscomb's leave, DePuy met with Human Resources at Hi-Vac to inquire about paying Lipscomb as a part time employee while on leave to supplement her income. Hi-Vac Human Resources informed DePuy that it was not legal to pay an employee for any hours worked while utilizing short-term disability.

122.     Despite DePuy's idea being denied in no uncertain terms, DePuy nonetheless fraudulently issued a $4,650 check to Lipscomb.

**Unauthorized Fees Paid to Kylie Foster**

123.     Via a letter dated January 22, 2021, Greenwold, on behalf of Hi-Vac, entered into an agreement with Kylie Foster that provided for a $5,000 finder's fee "for any customer that she actively introduces to Hi-Vac Corporation within a dealer territory."

124.     Despite there being no indication that Foster introduced any customers to Hi-Vac, Hi-Vac paid Foster $5,000 in connection with a sale made by Pat's Pumps, a Hi-Vac dealer/distributor to Vacuum Dig Enterprises, Inc. Hi-Vac has found no evidence indicating that Foster introduced Vacuum Dig to Hi-Vac or Pat's Pump.

125.     Greenwold requested this finder's fee and Dan Coley authorized it.

**Unearned Commissions Paid to Curtis Coley**

126.     In or about May 2019, Dan Coley decided to make looting Hi-Vac a family enterprise by retaining his brother, Curtis Coley, as an independent agent purportedly to represent

Hi-Vac in transactions with a company called "Carylon Corporation of Companies" in exchange for a fee based on profits from sales to that company.

127.    Curtis Coley executed an Independent Consulting and Service Agent Agreement ("Consulting Agreement") with Hi-Vac to

> . . . consult on customer acquisition of the Carylon Corporation of Companies services and technology for Sewer Cleaning equipment and accessories and to solicit orders for the sale of Company's Sewer Cleaning Products . . . for the Carylon Corporation of Companies.

128.    Under the Consulting Agreement, Curtis Coley was to be paid 30% of the profit for these transactions based on the Dealer Net Price as commissions for his services. The Consulting Agreement further provided Curtis Coley would be paid $6,000 per month as advances on commissions, and that the advances would be reconciled at year end. In total, Hi-Vac advanced $42,000 to Curtis Coley under the agreement.   The Curtis Coley Consulting Agreement is attached hereto as Exhibit G.

129.    The amounts were paid as follows:

| Check Number | Check Date | Amount |
|---|---|---|
| 101525 | 5/24/2019 | $6,000.00 |
| 002180 | 7/3/2019 | 6,000.00 |
| 002209 | 8/2/2019 | 6,000.00 |
| 002245 | 9/5/2019 | 6,000.00 |
| 002270 | 10/3/2019 | 6,000.00 |
| 002294 | 11/7/2019 | 6,000.00 |
| 002313 | 12/5/2019 | 6,000.00 |
| | | $42,000.00 |

130.    However, at no point in time relevant to these transactions did Hi-Vac make any sales to the Carylon Corporation of Companies.

131.    Indeed, when Alliance engaged a forensic accounting firm—GBQ Consulting—to review the transactions at issue, it was unable to identify a company by that name. Although GBQ Consulting was able to identify a "Carylon Corporation," Hi-Vac had not done any business with Carylon Corporation or any of its affiliated entities during the period relevant to these payments to Curtis Coley.

132.    These advances were never reconciled or clawed back from Curtis Coley.

**<u>Dan Coley's Letter of Intent, Patent Application, and NDA</u>**

133.    Prior to Dan Coley's termination from Hi-Vac, he had begun pursuing business opportunities in conflict and/or competition with the business of Hi-Vac and Alliance.

134.    On or about July 23, 2021, prior to his termination, Dan Coley executed a letter of intent for the acquisition of Wink Vibracore Drill Company Ltd. ("Wink Vibracore") through Verde Properties, LLC ("Verde"). Wink Vibracore sells products related to "vibracoring" (sonic) drilling equipment and technology used to obtain core samples. Wink Vibracore describes "vibracore" and "sonic" as essentially the same, with both referring to the same drilling technology. See https://www.vibracorer.com/home/ (visited September 8, 2023 at 10:48 AM).

135.    In addition to Hi-Vac, the Alliance family of affiliated companies is comprised of a diverse group of other industrial, retail, and real estate companies, including, among others, Terra Sonic International, LLC ("Terra Sonic International"). Terra Sonic International is committed exclusively to sonic drilling technology and is engaged in the production, sale, service and development of sonic drilling rigs, sonic drill heads and associated sonic equipment, components and technologies.

26

136.    Despite Wink Vibracore being involved in, and using, sonic technologies and products, Dan Coley never involved anyone at Terra Sonic International or Alliance in his personal discussions with Wink Vibracore regarding his interest and ideas related to its sonic technologies and products.

137.    In late September 2020, Wink Vibracore quoted Hi-Vac for a "portable Vibracore Drill system."  Later that year, that product was observed as having been delivered to Hi-Vac's receiving location in Marietta, Ohio.

138.    The product was never entered into Hi-Vac inventory or paid for by Hi-Vac.

139.    On information and belief, the portable Vibracore Drill System was moved from the Hi-Vac receiving area by or at the direction of Dan Coley and diverted to and for the personal use and benefit of Dan Coley.

140.    Additionally, prior to the termination of his employment from Hi-Vac, Dan Coley was working with his personal patent counsel in the preparation of his own patent application related to a "vibration-vacuum excavating apparatus."

141.    On April 29, 2021, just four days after Dan Coley's employment with Hi-Vac was terminated, a patent application (application no. 17/244,405) was filed with the United States Patent Office for an "EXCAVATING METHOD AND VACUUM TO ELIMINATE THE NEED FOR FLUID."  The patent application is nearly identical to the patent application draft Dan Coley was working on prior to the termination of his employment with Hi-Vac.

142.    Vibration and vacuum excavation related products, technologies and services all touch and involve Terra Sonic International's and Hi-Vac's businesses.

143.    Upon information and belief, this patent was planned to incorporate a sonic product from Wink Vibracore.

144. The patent application relates to products or innovations that compete or potentially compete with Terra Sonic.

145. The patent application proposes a drilling method which uses a sonic/vibration methodology for soil excavation and as a result eliminates the need to use water in the fluidization process.

146. The patent application incorporates technologies owned by Terra Sonic and/or products or capabilities that could be adapted by Terra Sonic or others for use as a Hi-Vac's product offering, and at no point did Dan Coley ever disclose to or discuss with anyone at Hi-Vac, Alliance or Terra Sonic an idea for a product that might use vibration / sonic and suction elements of the type used by Hi-Vac (suction) and Terra Sonic (sonic) to reduce or eliminate the need for fluid-based vacuum systems as would (per the patent application) this Dan Coley patent.

147. On April 22, 2022, prior to the termination of his employment with Hi-Vac, Dan Coley, through a company referred to as "Verde," also signed a non-disclosure agreement with Last Arrow Manufacturing involving the possible supply of product by Last Arrow Manufacturing to Dan Coley and/or Verde.

148. At the time, Last Arrow Manufacturing, a metal fabrication company, was, and continues to be, a parts supplier for certain components used in the production of Hi-Vac products.

149. Additionally, in May 2017, Dan Coley engaged in an auction transaction purportedly in the name of Hi-Vac for the purchase of a used high pressure water jetting unit (a product similar to Hi-Vac's own water jetting units) through an auction sale conducted by IronPlanet for $15,500. Despite there being no record of any payment for this purchase having been made by Hi-Vac, IronPlanet confirmed to Dan Coley that payment had been made in full. On

information and belief, that purchase was arranged for and consummated by Dan Coley for his own resale or use of that unit.

150. In all of these transactions, Dan Coley was attempting to establish side businesses to compete with Alliance's Terra Sonic International affiliate, and/or use Terra Sonic International knowledge or other technologies and/or usurp business opportunities from Hi-Vac and Terra Sonic.

151. These opportunities also diverted Dan Coley's professional time and attention away from his position as President of Hi-Vac.

152. Upon information and belief, Dan Coley intended to use connections, insights, and other proprietary information gleaned from his work at Hi-Vac and familiarity with other Alliance businesses to build and capitalize on these personal business opportunities.

153. These transactions were in direct violation of the Dan Coley Agreement.

154. Specifically, these transactions represented competitive businesses that the Dan Coley Agreement forbids Dan Coley from participating in during the term of his employment.

155. Indeed, the Dan Coley Agreement specifically provides that companies dealing with "Municipal and Industrial Equipment used in . . . excavation equipment and services" are competitive with Hi-Vac. (Ex. A, Addendum D, Ex. B).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of RICO, 18 U.S.C. §§ 1961 *et seq*.—Coley Enterprise**
**(Against Daniel Coley, Greenwold, DePuy, Gensler, Lipscomb, Curtis Coley and Dickinson)**
**("RICO Defendants")**

156. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

29

157. Plaintiffs bring this claim against Defendants Daniel Coley, Matthew Greenwold, Randy DePuy, Brian Gensler, Lindsay Lipscomb, Curtis Coley and Karl Dickinson, each of whom is a "person" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

158. The RICO Defendants together formed an association-in-fact enterprise ("Coley Enterprise") for the purposes of converting, embezzling and defrauding funds, products, technology, and ideas from Plaintiffs for the purposes of converting financial gain for its members.

159. The Coley Enterprise consisted of then-current and former employees and contractors of Hi-Vac who were led by President Daniel Coley.

160. At all relevant times, the Coley Enterprise: (a) had an existence separate and distinct from other Hi-Vac employees; (b) was an ongoing and continuing organization consisting of legal entities, including each of the RICO Defendants; (c) was characterized by interpersonal relationships among the RICO Defendants; (d) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the Coley Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the profits converted due to the group's fraudulent activity.

161. The RICO Defendants carried out, or attempted to carry out, a scheme to defraud Plaintiffs by knowingly conducting or participating in the conduct of the Coley Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 1344 (financial institution fraud), and §§ 1956 and 1957 (money laundering).

162. The RICO Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of U.S.C.

§§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the RICO Defendants committed, or aided and abetted in the commission of, were related to each other and posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of Hi-Vac's facilities, services, technology, customer information, products, and employees. The RICO Defendants participated in the scheme to defraud using mail, telephone, and internet to transmit mailings and wires in interstate or foreign commerce.

163. The RICO Defendants also conducted and participated in the conduct or affairs of the Coley Enterprise through a pattern of racketeering activity by felonious embezzlement, theft, conversion, money laundering and fraud.

164. The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

    a. Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to convert, embezzle and defraud funds, products, technology, and ideas from Plaintiffs by means of false pretenses, misrepresentations, promises and omissions.

    b. Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to convert, embezzle and defraud funds, products, technology, and ideas from Plaintiffs by means of false pretenses, misrepresentations, promises and omissions.

165. The RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States through this enterprise.

166. The RICO Defendants aided and abetted others in the violations of the above laws, rendering them indictable as principals in the U.S.C. §§ 1341 and 1343 offenses.

167. The RICO Defendants hid and actively worked to conceal their misconduct from Plaintiffs.

168.    The RICO Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in converting, embezzling and defrauding funds, products, technology, and ideas from Plaintiffs.

169.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from defrauding Plaintiffs.  The predicate acts also had the same or similar results, participants, victims, and methods. The predicate acts were related and not isolated events.

170.    The predicate acts all had the purpose of substantially harming Plaintiffs' business and property, while simultaneously generating substantial revenues for the RICO Defendants. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Coley Enterprise and in furtherance of its fraudulent scheme.

171.    The pattern of racketeering activity alleged herein and the Coley Enterprise are separate and distinct from each other.  Likewise, the RICO Defendants are distinct from the enterprise.

172.    The pattern of racketeering activity alleged herein was continuing up until the dates of termination of employment of nearly all of the RICO Defendants on April 25, 2022.

173.    Many of the precise dates of the RICO Defendants' criminal actions at issue here have been concealed by Defendants and were not discoverable in the exercise of reasonable diligence by Plaintiffs.  Indeed, an essential part of the successful operation of the Coley Enterprise alleged herein depended upon secrecy.

174. By converting, embezzling and defrauding funds, products, technology, and ideas from Plaintiffs, Defendants engaged in a fraudulent scheme and an unlawful course of conduct constituting a pattern of racketeering activity.

175. It was foreseeable to the RICO Defendants that Plaintiffs would be harmed when they converted, embezzled, and defrauded funds, products, technology, and ideas from Plaintiffs.

176. The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

177. The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs injury in their business and property. The RICO Defendants' pattern of racketeering activity included converting, embezzling and defrauding funds, products, technology, and ideas from Plaintiffs which logically, substantially and foreseeably harmed Plaintiffs' business and property.

178. Plaintiffs were substantially injured by the RICO Defendants' pattern of racketeering activity.

179. The RICO Defendants knew their actions would cause harm to Plaintiffs. Nevertheless, the RICO Defendants engaged in a scheme of deception, that utilized the mail and wire transfers as part of their fraud, in order to convert, embezzle and defraud funds, products, technology, and ideas from Plaintiffs by means of false pretenses, misrepresentations and omissions.

180. The RICO Defendants' predicate acts and pattern of racketeering activity has injured Plaintiffs in the form of substantial losses of money and property that logically, directly and foreseeably arise from the Coley Enterprise.

181. Specifically, the Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

   a. Loss of business opportunities;
   b. Damage to reputation;
   c. Converted property;
   d. Loss of profits and revenues;
   e. Loss of money from bank accounts; and
   f. Costs of investigating these incidents.

182. Plaintiffs' injuries were proximately caused by Defendants' racketeering activities because they were the logical, substantial, and foreseeable cause of Plaintiffs' injuries. But for the Coley Enterprise created by Defendants' conduct, Plaintiffs would not have lost money or property.

183. Plaintiffs' injuries were directly caused by the RICO Defendants' pattern of racketeering activities.

184. Plaintiffs seek all legal and equitable relief as allowed by law, including, *inter alia*, actual damages; treble damages; equitable and/or injunctive relief; forfeiture as deemed proper by the Court; attorneys' fees; all costs and expenses of suit, pre- and post-judgment interest, including, *inter alia*:

   a. Actual damages and treble damages, including pre-suit and post-judgment interest;
   b. An order enjoining any further violations of RICO;
   c. An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;
   d. An order enjoining the commission of any tortious conduct, as alleged in this Complaint;
   e. An order enjoining the commission of any further contractual breaches, as Alleged in this Complaint.
   f. An order divesting each Defendant of any interest in, and the proceeds of any interest in, the Coley Enterprise, including any interest in property associated with the Coley Enterprise;
   g. Forfeiture as deemed appropriate by the Court; and
   h. Attorneys' fees and all costs and expenses of suit.

## SECOND CLAIM FOR RELIEF
### Violation of the Ohio Corrupt Practices Act
### Ohio Revised Code §§ 2923.31, *et seq.*
### (Against Daniel Coley, Greenwold, DePuy, Gensler, Lipscomb, Curtis Coley and Dickinson)

185. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

186. Plaintiffs bring this claim against Defendants Daniel Coley, Matthew Greenwold, Randy DePuy, Brian Gensler, Lindsay Lipscomb, Curtis Coley and Karl Dickinson, each of whom is a "person" within the meaning of Ohio Rev. Code Ann. § 2923.31(G).

187. For efficiency and to avoid repetition, for purposes of this claim, Plaintiffs incorporate by reference the paragraphs of Plaintiffs' First Claim for Relief concerning the Coley Enterprise.

188. As alleged above, each of the RICO Defendants were members of an association-in-fact enterprise, the Coley Enterprise, within the meaning of Ohio Rev. Code Ann. § 2923.31(C).

189. As alleged above, each of the RICO Defendants conducted and participated in the conduct of the affairs of this Enterprise through a pattern of "corrupt activities" as defined in Ohio Rev. Code Ann.§ 2923.31(I)(1) and (2).

190. As previously alleged, the RICO Defendants engaged in a pattern of corrupt activities defined as "racketeering activities" in 18 U.S.C. § 1961(1)(B), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). The RICO Supply Chain Defendants' acts also constitute a pattern of telecommunications fraud (Ohio Rev. Code Ann. § 2913.05).

191. As described above, the RICO Defendants executed their unlawful scheme by converting, embezzling, and defrauding funds, products, technology, and ideas from Plaintiffs by embezzlement, conversion, money laundering, theft, and fraud.

192.     Each of the RICO Defendants knew their unlawful and fraudulent scheme was causing harm to Plaintiffs and actively advanced it.

193.     The RICO Defendants formed and pursued their common purpose through the confidential personal interactions that they had.

194.     The RICO Defendants violated the Corrupt Practices Act by engaging in mail and wire fraud.  The RICO Defendants' common purpose and fraudulent scheme was intended to, and did, utilize interstate mail and wire facilities for the commission of their fraud in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

195.     The RICO Defendants violated the Corrupt Practices Act by engaging in telecommunications fraud.  The RICO Defendants' common purpose and fraudulent scheme was intended to, and did, disseminate, or transmit writings, data, signs, signals, pictures, sounds or images by means of wire, internet, telecommunication, telecommunications devices or services in furtherance of the scheme to defraud.

196.     The RICO Defendants engaged in systematic and fraudulent acts as part of the Coley Enterprise that furnished false or fraudulent material information in, and omitted material information from, their sales and distributions when converting, embezzling and defrauding funds, products, technology and ideas from Plaintiffs for the purposes of converting financial gain for its members.

197.     The end result of the RICO Defendants' fraudulent scheme and common purpose was to continuously achieve financial gain for its members.

198.     The RICO Defendants' violations of law and their pattern of racketeering activity directly and indirectly caused Plaintiffs' injury.  Their pattern of corrupt activity logically, substantially and foreseeably caused injuries to Plaintiffs.

199. As a result, the RICO Defendants' pattern of corrupt activity caused injury to Plaintiffs in the form of substantial losses of money and property that logically, directly and foreseeably arise from the Coley Enterprise. Plaintiff's injuries, as alleged throughout this complaint, and expressly incorporated herein by reference include:

a. Loss of business opportunities;
b. Damage to reputation;
c. Converted property;
d. Loss of profits and revenues;
e. Loss of money from bank accounts; and
f. Costs of investigating these incidents.

200. Plaintiffs seek all legal and equitable relief as allowed by law, including, *inter alia*, actual damages; treble damages; equitable and/or injunctive relief, under Ohio Rev. Code § 2923.34(B)(1)-(2), requiring divestiture by, and reasonable restrictions upon, the future activities of the Defendants; forfeiture as deemed proper by the Court; attorneys' fees and all costs; expenses of suit; and pre- and post-judgment interest.

### THIRD CLAIM FOR RELIEF
### Common Law Fraud
**(Against Daniel Coley, Matthew Greenwold, Randy DePuy, Brian Gensler, Lindsay Lipscomb, Curtis Coley, G6 Environmental Equipment LLC and L-Gen Services)**

201. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

202. Plaintiffs bring these actions against Daniel Coley, Greenwold, DePuy, Gensler, Lipscomb, Curtis Coley, G6, and L-Gen Services ("Fraud Defendants").

203. The Fraud Defendants each actively deceived Plaintiffs by intentionally and unlawfully making false statements.

204. The Fraud Defendants also actively deceived Plaintiffs intentionally and unlawfully by omitting and/or concealing information.

205. Specifically, the Fraud Defendants' knowing deceptions during the relevant period, include but are not limited to:

**1. G6 transactions**

a. Greenwold, with the participation of mastermind Dan Coley, perpetuated a scheme to defraud Hi-Vac to line his own pockets by arranging for the sale by Hi-Vac to his own company—G6—at heavily discounted prices, ignoring Hi-Vac sales policies, and reselling them to purchasers (that otherwise would have been Hi-Vac customers) at a substantial mark-up in competition with Hi-Vac.

b. Greenwold and Coley arranged for Hi-Vac to sell its products to G6-Greenwold's own company-at substantially discounted selling prices.

c. The trucks were sold to G6 at a price which should have only been available to legitimate, authorized Hi-Vac dealers/distributors.

d. Hi-Vac's sales policies include dealer/distributor pricing, as well as standard list pricing for non-dealer/distributors. G6 was not an authorized dealer/distributor.

e. As a non-dealer/distributor, sales to G6 (if authorized at all) should have been at or about the standard list pricing for the trucks.

f. However, G6 resold these heavily discounted trucks, in competition with Hi-Vac, to end-users with a substantial mark-up by G6.

g. The benefit of these transactions accrued directly to G6 and Greenwold and eventually to Dan Coley and other Conspirators.

h. By selling to G6, his own company, these trucks at the dealer/distributor price, Greenwold caused Hi-Vac to incur the following losses:

| Description | List Price | Price to G6 | Loss |
|---|---|---|---|
| Sales Order #22773 for XV-5810 | $506,500 | $434,840 | $71,660 |
| Sales Order #24787 for XV-5844 | $479,289 | $407,117 | $72,172 |
| Sales Order #24812 for XV-5883 | $445,922 | $380,104 | $65,818 |
| Total | $1,431,711 | $1,222,061 | $209,650 |

i. Order # 22773 was for a X-13 Hydro Excavator with add-ons.

j. Order # 24787 was for a X-8 (Demo) Hydro Excavator with add-ons.

k. Order # 24812 was for an X-8 Hydro Excavator with add-ons.

l. In addition to the improper discounts on standard list pricing for these trucks sold to G6, Dan Coley and Greenwold arranged for the additional improper discounts and expense waivers related to those sales :

| Sales Order # | Description | Loss |
|---|---|---|
| 22773 | Scale added to equipment at no cost to G6 | $5,600 |

| | | |
|---|---|---|
| 22773 | Steel Surcharge waived by Coley | $4,101 |
| 24787 | Additional discount authorized by Coley | $6,500 |
| 24787 | Freight charge waived by Coley | $2,000 |
| 24812 | Freight Charge waived by Coley | $1,639 |
| | Total | $19,840 |

**2. City of Stow Truck Trade-In**

a. In or about the first quarter of 2020, the city of Stow, Ohio purchased a truck from Hi-Vac. As part of this transaction, Stow traded-in a truck for a credit of $35,000 against the cost of the new vehicle.

    i. Greenwold coordinated this nefarious transaction, with support from DePuy and Dickinson. G6, Greenwold's company, purchased the traded-in truck from Hi-Vac for $35,000—the same amount as the credit given to Stow on the purchase of its new vehicle. G6 then resold the traded-in truck for a substantial profit of $45,000, profit that otherwise would have been Hi-Vac's.

    ii. DePuy facilitated this transaction in his role as Controller for Hi-Vac. He applied a $35,000 credit to the purchase price of the truck sold to Stow and directed that a purchase order be obtained from G6 for the traded-in truck that was purchased by G6 from Hi-Vac at cost.

    iii. As a result, Hi-Vac, through the efforts of Greenwold, Depuy and Dickinson, not only applied a $35,000 credit to Stow's order for its new truck, but lost out on the opportunity to both recoup that cost and make a profit on the resale of the trade-in. Resales of trade-ins represent a significant profit opportunity for Hi-Vac. That profit is, of course, not available if trade-ins are resold at cost.

**3. Unauthorized expenses;**

a. On or about March 21, 2022, prior to Lipscomb leaving on maternity leave, Ms. Brooker noticed a few checks clear the company account of which Hi-Vac had no knowledge. These checks were not accounted for in the company's "outstanding checks list."

    i. One of these checks was issued on March 7, 2022, to L-GEN Services with the address of P.O. Box 506 Lindsay, Texas for $11,000.

    ii. The $11,000 check was purportedly supported by two check requests:

        1. A February 17, 2022, request for a $5,500 expense documented as services paid for "customer entertainment."

        2. A March 7, 2022, request for a $5,500 expense documented as services paid for "customer entertainment."

    iii. Despite this check being unsubstantiated and fraudulent, Dan Coley approved this check, Lipscomb issued it, DePuy signed it, and Gensler endorsed and deposited it.

   b. Dan Coley, DePuy, Gensler and Lipscomb conspired to misappropriate Hi-Vac funds for a hunting retreat in Texas with full knowledge that the hunting retreat was not an approved Hi-Vac expense.

      i. In or about April 2019, Dan Coley and Gensler presented a proposal to lease land in Texas to use as a hunting camp to entertain current and prospective clients to Alliance senior management.

      ii. The cost of the lease was $16,800 for June 1, 2019, through June 1, 2020

      iii. To fund this camp and further benefit themselves, Dan Coley, DePuy, Gensler, and Lipscomb used Hi-Vac funds obtained through a series of unauthorized checks paid to Gensler and L-Gen over the course of 2019 and 2020. In total, Gensler and L-Gen received at least $150,896 in unauthorized and improper payments, comprised of the $11,000 of fraudulent payments described above at Paragraphs 86-91, and additional fraudulent payments in the amount of $139,896 described at Paragraphs 97-109.

   c. Dan Coley, Gensler, Lipscomb, and DePuy exploited their knowledge of Hi-Vac's internal controls and confidential customer lists and information in order to issue the fraudulent payments described above at Paragraphs 86-91 and another $139,896 in additional fraudulent payments to Gensler by funneling those additional payments through a fictitious Hi-Vac vendor account.

      i. From May 30, 2019 through August 31, 2020, Hi-Vac issued several checks that were initially entered into the accounts payable system by Lipscomb and DePuy as payables to a fictitious account. The fictitious account was set up to look like an account related to payables owing to a legitimate Hi-Vac customer account using confidential information in the Hi-Vac customer and vendor records. Lipscomb and DePuy simply added "- Commission Only" to the name of a legitimate customer to create the fictitious account.

      ii. Under the cover of this fictitious account, check requests were fraudulently entered into the Hi-Vac payables system for $139,896 in fraudulent payments to Gensler, purportedly for commissions, and expense reimbursements. DePuy and Lipscomb, seemingly not content with simply using a fictitious vendor, overwrote the name of the fictitious account with that of Gensler and wrote checks to the account for Gensler in the aggregate amount of $135,000 for fake commissions and $4,896 for fraudulent expense reimbursement. The checks paid to Gensler ("Gensler Checks") were not connected in any way to commissions or any other legitimate payment to Gensler, were not properly authorized, were not for legitimate business purposes and did not represent moneys properly owning by Hi-Vac to Gensler. The Gensler Checks were comprised of Check Number 101406 dated May 21, 2019, in the amount of $25,000; Check Number 101539 dated May 30, 2019, in the amount of $20,000; Check Number 102009 dated June 27, 2019, in the amount of $20,000; Check Number 103997 dated October 23, 2019, in the amount of $5,000;

Check Number 105579 dated February 10, 2020, in the amount of $5,000; Check Number 106356 dated April 3, 2020, in the amount of $20,000; Check Number 107009 dated May 21, 2020, in the amount of $25,000; and Check Number 107931 dated August 13, 2020, in the amount of $15,000.

   iii.   In addition to the $135,000 in fake commission payments, Dan Coley and his compatriots used the Gensler Checks to pay Gensler for improper expenses that would not have been allowed if they had been submitted and processed via proper means. These expenses included $4,500 for use of Gensler's personal vehicle and $395.54 for a firearm Gensler purchased. These expenses were unsubstantiated and fraudulent.

   iv.   The Gensler Checks were produced by Lipscomb and signed by DePuy. Some of these checks were approved by Dan Coley.

   v.   Dan Coley, Gensler, Lipscomb, and DePuy utilized a fictitious account, creatively disguised as a payable account related to a legitimate Hi-Vac customer, to hide these fraudulent transactions.

d.   Hi-Vac had an Accounting Department credit card ("Accounting Card") that was intended to be physically located at the company and used to purchase items in the ordinary course of business such as IT-related subscriptions. However, DePuy began carrying the Accounting Card on his person and using it for other purposes, including frequent staff lunches, travel and other expenditures for him and a family member in Texas related to the hunting camp.

   i.   Because these expenses were charged to the Accounting Card that only DePuy and Lipscomb reviewed rather than submitted for reimbursement through Hi-Vac's expense reporting system, the expenses charged to the card were not reviewed as they typically would have been. DePuy was thus able to make charges that would otherwise have been disallowed if they were submitted as reimbursements.

   ii.   Alliance reviewed the charges to the Accounting Card during the period from March 19, 2020, to March 31, 2022, and identified $8,674 in unauthorized expenses with no business purposes and $5,922 in expenses with an unclear business purpose.

   iii.   The transactions for this card include:

      1.   Several airline flights to Texas in DePuy's name
      2.   Hotels, rental vehicles, fuel, and toll charges in Texas
      3.   Charges for purchases at Sam's Club, Academy Sport, Bass Pro Shop in Texas
      4.   Charges for TRI County Electric and the City of Megargel, Texas (utilities).

e.   Additionally, Lipscomb ordered a credit card designated the "Sales Dept 2" card and issued it to Gensler when he was no longer a Hi-Vac employee.

   i.   Lipscomb advised Ms. Brooker, before she went on maternity leave, to go directly to DePuy if there were any concerns with the Sales Dept 2 card.

   ii.   Sales Dept 2 had $9,300 worth of charges from December 9, 2020, through November 11, 2021. Transactions on the card include:

1. Charges for ATMOS Energy in Texas for gas service (utility) for address: 423 State Highway 114, Megargel, TX
2. The City of Megargel, Texas for water service (utility) for address: 423 State Highway 114, Megargel, TX
3. Direct TV charges for Brian Gensler's home address
4. Utility Services through RTI County Electric in Texas
5. Tractor Supply in Texas for fencing
6. Each of these charges was entirely improper and would not have been allowed if their true nature was apparent to Hi-Vac.

4. **Fraudulent payments to employees and contractors**

a. Dan Coley, DePuy, and Greenwold regularly and systematically caused payments to be issued to employees and contractors for work that was never performed.

   i. Lipscomb took Family and Medical Leave Act and short-term disability leave beginning on March 23, 2022, which continued through the date of her termination on April 25, 2022.

      1. Prior to Lipscomb's leave, DePuy met with Human Resources at Hi-Vac to inquire about paying Lipscomb as a part time employee while on leave to supplement her income. Hi-Vac Human Resources informed DePuy that it was not legal to pay an employee for any hours worked while utilizing short-term disability.

   ii. Despite DePuy's idea being denied in no uncertain terms, DePuy nonetheless fraudulently issued a $4,650 check to Lipscomb.Via a letter dated January 22, 2021, Greenwold, on behalf of Hi-Vac, entered into an agreement with Kylie Foster that provided for a $5,000 finder's fee "for any customer that she actively introduces to Hi-Vac Corporation within a dealer territory."

   iii. Despite there being no indication that Foster introduced any customers to Hi-Vac, Hi-Vac paid Foster a $5,000 in connection with a sale made by Pat's Pumps, a Hi-Vac dealer/distributor to Vacuum Dig Enterprises, Inc. Hi-Vac has found no evidence indicating that Foster introduced Vacuum Dig to Hi-Vac or Pat's Pump.

   iv. Greenwold requested this finder's fee and Dan Coley authorized it

b. In or about May 2019, Dan Coley decided to make looting Hi-Vac a family enterprise by retaining his brother, Curtis Coley, as an independent agent purportedly to represent Hi-Vac in transactions with a company called "Carylon Corporation of Companies" in exchange for a fee based on profits from sales to that company.

   i. Curtis Coley executed an Independent Consulting and Service Agent Agreement ("Consulting Agreement") with Hi-Vac to

   ii. . . . consult on customer acquisition of the Carylon Corporation of Companies services and technology for Sewer Cleaning equipment and accessories and to solicit orders for the sale of Company's Sewer Cleaning Products . . . for the Carylon Corporation of Companies.

   iii. Under the Consulting Agreement, Curtis Coley was to be paid 30% of the profit for these transactions based on the Dealer Net Price as commissions

for his services. The Consulting Agreement further provided Curtis Coley would be paid $6,000 per month as advances on commissions, and that the advances would be reconciled at year end. In total, Hi-Vac advanced $42,000 to Curtis Coley under the agreement.

iv. However, at no point in time did Hi-Vac make any sales to the Carylon Corporation of Companies.

v. Indeed, when Alliance engaged a forensic accounting firm—GBQ Consulting—to review the transactions at issue, it was unable to identify a company by that name. Although GBQ Consulting was able to identify a "Carylon Corporation," Hi-Vac had not done any business with Carylon Corporation or any of its affiliated entities during the period relevant to these payments to Curtis Coley.

vi. These advances were never reconciled or clawed back from Curtis Coley.

206.    In each of the circumstances described in the foregoing paragraphs, the Fraud Defendants knew that they were intentionally making false statements and omitting and/or concealing information.

207.    Additionally, Defendants had a duty not to deceive Plaintiffs because they were employees trusted by Plaintiffs to work in their best interest.

208.    These Defendants made these false representations and concealed facts with knowledge of the falsity of their representations.  These Defendants' false representations and concealed facts were material to the conduct and actions at issue.

209.    The Fraud Defendants intended and had reason to expect under the circumstances that the Plaintiffs would be deceived by Defendants' statements, concealments, and conduct as alleged herein and that Plaintiffs would act or fail to act in reasonable reliance thereon.

210.    Defendants intended and knew that this reasonable and rightful reliance would be induced by these Defendants' misrepresentations and omissions, and Defendants intended and knew that such reliance would cause Plaintiffs to suffer loss.

211.    Plaintiffs did in fact rightfully, reasonably, and justifiably rely on Fraud Defendants' representations and/or concealments, both directly and indirectly.  As the Fraud Defendants knew

or should have known, Plaintiffs were directly and proximately injured as a result of this reliance, and Plaintiffs' injuries were directly and proximately caused by this reliance.

212.    As a result of these representations and/or omissions, Plaintiffs were defrauded funds, products, technology, and ideas.

213.    By reason of their reliance on Fraud Defendant's misrepresentations, and omissions of material fact, Plaintiffs suffered damages.

214.    Defendants' misconduct alleged in this case is ongoing and persistent.

215.    These Defendants' conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

216.    Fraud Defendants' actions demonstrate both malice and also aggravated and egregious fraud.  Defendant's fraudulent wrongdoing was also gross, malicious, and wanton.

217.    Plaintiffs seek all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorneys' fees and costs, and pre-and post-judgment interest.

**FOURTH CLAIM FOR RELIEF**
**Defend Trade Secrets Act 18 U.S.C. §§ 1836 *et seq*.**
**(Against Dan Coley, Greenwold, DePuy, Gensler, Lipscomb, and Dickinson)**

218.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

219.    The information utilized by Dan Coley, Greenwold, DePuy, Gensler, Lipscomb, and Dickinson that is the subject of this Complaint, as described above, meets the definition of a "trade secret" under 18 U.S.C. § 1839(3) as it contains financial, business, and economic information including plans, compilations, formulas, methods, processes, procedures, and

programs, including but not limited to customer lists, as well as customer financial information, customer contact information, pricing information, employee information, and business advice and strategies. Specifically, these defendants utilized Plaintiffs' confidential information regarding customers, pricing, and accounting practices in order to further their tortious schemes and cover them up.

220.    Hi-Vac took reasonable measures to protect this information as required by 18 U.S.C § 1839(3)(a), including but not limited to requiring its employees (including Defendants) to sign contracts to protect the secrecy of this information.

221.    These trade secrets have independent economic value due to their secrecy, as they are not generally known and not readily ascertainable through proper means.

222.    These trade secrets are related to goods sold in interstate commerce, as Hi-Vac sells and distributes its products throughout the United States.

223.    Defendants misappropriated Hi-Vac and Alliance's trade secrets, thus giving rise to civil liability under 18 U.S.C. § 1839.  Specifically, Defendants improperly utilized Hi-Vac and Alliance's trade secrets in order to commit several tortious acts against Hi-Vac and Alliance.

224.    Defendants' conduct was willful, intentional, and unprivileged, and has caused and is continuing to cause irreparable harm as well as monetary damages to Hi-Vac.

225.    Because of the willfulness and maliciousness of Defendants' conduct, Hi-Vac is entitled to exemplary damages in the amount of two times its actual damages. 18 USC § 1836(b)(3)(C).

## FIFTH CLAIM FOR RELIEF
### Defend Trade Secrets Act 18 U.S.C. §§ 1836
### (Against Dan Coley)

226.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege as follows.

227.     The information utilized by Dan Coley in his dealings with Wink Vibracore, patent application, and Last Arrow Manufacturing as described above, meets the definition of a "trade secret" under 18 U.S.C. § 1839(3) as it contains business, scientific, technical, or engineering information including plans, compilations, formulas, methods, processes, procedures, programs, including but not limited information regarding sonic drilling and vacuum apparatuses. Specifically, Dan Coley utilized Plaintiffs' trade secrets regarding sonic drilling and vacuum apparatuses to attempt to establish side businesses and compete with Plaintiffs.

228.     Plaintiffs took reasonable measures to protect this information as required by 18 U.S.C § 1839(3)(a), including but not limited to requiring employees (including Dan Coley) to sign contracts to protect the secrecy of this information.

229.     These trade secrets have independent economic value due to their secrecy, as they are not generally known and not readily ascertainable through proper means.

230.     These trade secrets are related to goods sold in interstate commerce, as Hi-Vac sells and distributes its products throughout the United States.

231.     Due to Dan Coley's possession of Plaintiffs' trade secrets and use of them in his personal dealings as described above, the Plaintiffs face threatened misappropriation as defined in 18 U.S.C. § 1839(5).

232.     Misappropriation of Plaintiff's trade secrets will cause them irreparable harm due to the uniqueness of them and substantial investment made into acquiring them.

233. As a result, Plaintiffs require an injunction to prevent Defendant Coley from actual and/or threatened misappropriation of their trade secrets pursuant to 18 USC § 1836(b)(3)(A)(i).

234. Upon information and belief Defendant Coley misappropriated Hi-Vac and Alliance's trade secrets, which requires thus giving rise to civil liability under 18 U.S.C. § 1839. Specifically, Defendants improperly utilized Hi-Vac and Alliance's trade secrets in order to commit several tortious acts against Hi-Vac and Alliance.

235. Dan Coley's conduct was willful, intentional, and unprivileged, and has caused and is continuing to cause irreparable harm as well as monetary damages to Hi-Vac.

236. Because of the willfulness and maliciousness of Dan Coley's conduct, Hi-Vac is entitled to exemplary damages in the amount of two times its actual damages. 18 USC § 1836(b)(3)(C).

### SIXTH CLAIM FOR RELIEF
### Ohio Uniform Trade Secrets Act R.C. §§ 1333.61, *et seq*.
### (Against Dan Coley, Greenwold, DePuy, Gensler, Lipscomb, and Dickinson)

237. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

238. Dan Coley, Greenwold, DePuy, Gensler, Lipscomb, and Dickinson acquired knowledge of confidential and trade secret information belonging to Hi-Vac, as the term "trade secrets" is defined under the Ohio Uniform Trade Secrets Act, R.C. §§ 1333.61, *et seq*., including but not limited to the information outlined herein and above. Specifically, these defendants utilized Plaintiffs' confidential information regarding customers, pricing, and accounting practices in order to further their tortious schemes and cover them up.

239. These trade secrets have independent economic value and are critical to Hi-Vac's ability to serve existing and prospective customers and compete for their business.

240.     Hi-Vac takes and took reasonable steps to maintain confidentiality with respect to its confidential information and trade secrets, including but not limited to requiring its employees (including Defendants) to sign contracts to protect the secrecy of this information.

241.     R.C. § 1333.62 provides for the injunction of "actual or threatened" misappropriation of trade secrets.

242.     As a result of these Defendants' actual misappropriation of trade secrets, Hi-Vac has been damaged in an amount to be determined at trial.

243.     Upon information and belief, these Defendants' misappropriation was and is willful and malicious, warranting punitive damages and entitling Hi-Vac to attorneys' fees.

### SEVENTH CLAIM FOR RELIEF
### Ohio Uniform Trade Secrets Act R.C. §§ 1333.61, *et seq*.
### (Against Dan Coley)

244.     Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

245.     Dan Coley acquired knowledge of confidential and trade secret information belonging to Plaintiffs, as the term "trade secrets" is defined under the Ohio Uniform Trade Secrets Act, R.C. §§ 1333.61, *et seq*., including but not limited to the information outlined herein and above. Specifically, Dan Coley has comprehensive and detailed knowledge of Plaintiffs' business, products, scientific information, technical information, and engineering information regarding sonic drilling and vacuum apparatuses.

246.     These trade secrets have independent economic value and are critical to Plaintiffs' ability to serve existing and prospective customers and compete for their business.

247. Plaintiffs take and took reasonable steps to maintain confidentiality with respect to its confidential information and trade secrets, including but not limited to requiring its employees (including Dan Coley) to sign contracts to protect the secrecy of this information.

248. R.C. § 1333.62 provides for the injunction of "actual or threatened" misappropriation of trade secrets.

249. The actual and inevitable disclosure of Plaintiffs' trade secrets constitutes imminent, immediate, and irreparable harm to Plaintiffs for which they cannot be adequately compensated by monetary damages alone if the preliminary and permanent injunctive relief requested herein is not granted. Dan Coley has detailed and comprehensive knowledge of Plaintiffs' trade secrets and confidential information and has attempted to establish side businesses with competitors of Plaintiffs, among other companies, utilizing those same trade secrets and confidential information.

250. Upon information and belief, Dan Coley's misappropriation was and is willful and malicious, warranting punitive damages and entitling Plaintiffs to attorneys' fees.

251. Plaintiffs are further entitled to temporary, preliminary, and permanent injunctions preventing Dan Coley from doing business with or being employed by any competitors of Plaintiffs owing to the threatened misappropriation of Plaintiffs' trade secrets.

### EIGHTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (Against Dan Coley, Greenwold, DePuy, Gensler, Lipscomb, and Dickinson)

252. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

253. Under Ohio law, employees owe duties of good faith and loyalty to their employer. *E.g.*, *MNM & MAK Enters., LLC v. HIIT Fit Club, LLC*, 134 N.E.3d 242, 250 (Ohio Ct. App.

2019). Each defendant named in this count therefore, at the very least, owed these duties to Hi-Vac.

254.    Dan Coley, Greenwold, DePuy, Gensler[7], Lipscomb, and Dickinson failed to observe these duties by participating in schemes to misappropriate Plaintiffs' property and funds, misappropriating Plaintiffs' trade secrets, competing against Plaintiffs, and committing the other dishonest and fraudulent acts against Plaintiffs described herein.

255.    Pursuant to R.C. § 1701.641, Dan Coley, as an officer of Hi-Vac, owed a duty to "perform [his] duties in good faith, in a manner [he] reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances."

256.    In addition, the Dan Coley Agreement provides that Dan Coley "owe[d] a fiduciary duty of loyalty, fidelity, and allegiance to act at all times in the best interests of Employer[8] and the other Aii Group entities[9] and not recklessly or intentionally act in any manner which would directly or indirectly injury any such entities' business, interests or reputation."  (Ex. A, § 1.5).

257.    Dan Coley failed to observe the fiduciary duties he owed to Hi-Vac by engaging in schemes to misappropriate Plaintiffs' property and funds, misappropriating Plaintiffs' trade secrets, competing against Plaintiffs, and committing the other dishonest and fraudulent acts against Plaintiffs described herein.

258.    Defendants committed these acts willfully and maliciously.

259.    As a direct and proximate result of these breaches of Defendants' fiduciary duties, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

---

[7] Although Gensler committed some of the acts described herein while no longer an employee, he was an employee of Hi-Vac at the time he assisted in misappropriating Hi-Vac funds for the Texas Hunting Camp.
[8] This term is defined to mean Hi-Vac.
[9] This term is defined to mean Alliance and companies of which Alliance is the sole shareholder.

### NINTH CLAIM FOR RELIEF
### Conversion
### (Against all Defendants)

260.     Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

261.     Defendants have intentionally exerted dominion over Plaintiffs' property in a manner that is inconsistent with Plaintiffs' rights.

262.     Defendants have committed these acts willfully and maliciously.

263.     As a result of Defendants' conversion of Plaintiffs' property, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

### TENTH CLAIM FOR RELIEF
### Breach of Contract
### (Against Dan Coley, Curtis Coley, Greenwold, DePuy, Gensler, Lipscomb, and Dickinson)

264.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege as follows.

265.     Each Defendant named in this Count executed written contracts with Plaintiffs.

266.     Each Defendant named in this Count breached the contracts with Plaintiffs they had executed.

267.     Dan Coley breached the Dan Coley Agreement by, at the very least, utilizing Plaintiffs' confidential information in the commission of the tortious acts described herein, competing or assisting others in competing with Plaintiffs, and spearheading a conspiracy to misappropriate Plaintiffs' funds and property.

268.     Curtis Coley breached his Consulting Agreement with Hi-Vac by fraudulently retaining commissions based on sales to the "Carylon Corporation of Companies" that never occurred.

269. Greenwold breached the Greenwold Agreement by participating in a scheme to misdirect business opportunities from Hi-Vac to G6, operating a competing company, and exploiting Hi-Vac's confidential information for his own benefit.

270. DePuy breached the DePuy Agreement by exploiting Hi-Vac's confidential information and trade secrets for his own benefit, assisting Greenwold in competing with Hi-Vac through G6, improperly issuing funds, and

271. Gensler breached the Gensler Agreement by utilizing Hi-Vac's confidential information and trade secrets regarding customer account information for his own benefit, misusing company credit cards, and retaining money that was fraudulently issued to him.

272. Lipscomb breached the Lipscomb Agreement by utilizing Hi-Vac's confidential information and trade secrets regarding customer account information for her own benefit, assisting her cohorts in the misappropriation of Hi-Vac funds,

273. Dickinson breached the Dickinson Agreement by utilizing Hi-Vac's confidential information and trade secrets regarding customer account information and product pricing for his own benefit, assisting Greenwold in competing with Hi-Vac through G6, and by diverting profit on a trade-in that should have accrued to Hi-Vac.

274. At all times Plaintiffs complied with their duties under the contracts between and/or among the parties.

275. As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

## ELEVENTH CLAIM FOR RELIEF
### Unjust Enrichment (In the Alternative to the Breach of Contract Claim)
### (Against All Defendants)

276.   Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

277.   As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited by converting, embezzling and defrauding funds, products, technology, and ideas from Plaintiffs.

278.   Unjust enrichment arises not only when an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

279.   The expenditures incurred by Plaintiffs have also helped Defendants' businesses.

280.   Plaintiffs have conferred a benefit upon Defendants by paying for/incurring the costs of products, technology and ideas which were converted and used by Defendants.

281.   Defendants were aware of these benefits and their retention of them is unjust.

282.   Defendants have unjustly retained benefits to the detriment of Plaintiffs, and Defendants' retention of such benefits violates the fundamental principles of justice, equity, and good conscience.

283.   Plaintiffs seek an order compelling Defendants to disgorge all unjust enrichment to Plaintiffs; and awarding such other, further, and different relief as this Honorable Court may deem just.

## TWELFTH CLAIM FOR RELIEF
### Civil Conspiracy
### (Against Dan Coley, Greenwold, DePuy, Gensler, Lipscomb, and Dickinson)

284.   Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

285. Dan Coley, Greenwold, DePuy, Gensler, Lipscomb, and Dickinson agreed to work in concert to exploit Hi-Vac's cash, reputation, and other resources through fraudulent and improper transactions to personally benefit, to benefit friends and family, and to compete with and disparage Hi-Vac and Alliance.

286. As a result of this agreement, these Defendants did, in fact, misappropriate Hi-Vac's funds, trade secrets, and business opportunities to their own benefit.

287. The actions taken in furtherance of this conspiracy – including fraud, breach of contract, breach of fiduciary duties, the misappropriation of trade secrets, and conversion – described herein were unlawful.

288. Defendants acted with a common understanding or design to commit unlawful acts, and acted purposely, without a reasonable or lawful excuse, which directly caused the injuries alleged herein.

289. Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonable or lawful excuse.

290. Defendants' conspiracy, and Defendants' actions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

291. Defendants' actions demonstrated both malice and also aggravated and egregious fraud. Defendants engaged in the Conduct alleged herein with a conscious disregard for the rights of other persons, even though that conduct has a great probability of causing substantial harm. Defendants' fraudulent wrongdoing was also particularly gross, malicious, and wanton.

292. Defendants conduct is not a discrete event, it has been ongoing and persistent.

293. As a result of these unlawful acts, Plaintiffs have suffered damages in an amount to be proven at trial.

294. Plaintiffs seek all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre-and post-judgment interest.

### THIRTEENTH CLAIM FOR RELIEF
### Injury Through Criminal Acts R.C. § 2307.60
### (Against Dan Coley, Greenwold, DePuy, Gensler, Lipscomb, and Dickinson)

295. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

296. R.C. § 2307.60(A)(1) provides that:

> Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

297. As described more fully in count Two, Defendants engaged in a pattern of corrupt activity in violation of R.C. § 2923.32.

298. As described more fully in count Twelve, Defendants committed a conspiracy in violation of R.C. § 2923.01 by engaging in a pattern of corrupt activity.

299. Defendants have engaged in additional criminal acts detailed in the RICO and Ohio Corrupt Practices Act Counts above, including acts of criminal wire fraud, mail fraud, telecommunications fraud, violations of RICO, and violations of the Ohio Corrupt Practices Act.

300. It was foreseeable to Defendants that their misconduct alleged in this Count would cause injury to Plaintiffs in the form of substantial losses of money and property that logically,

directly and foreseeably arise from their misconduct.  Plaintiff's injuries, as alleged throughout this complaint, and expressly incorporated herein by reference include:

      a.  Loss of business opportunities;

      b.  Damage to reputation;

      c.  Converted property;

      d.  Loss of profits and revenues;

      e.  Loss of money from bank accounts; and

      f.  Costs of investigating these incidents.

301.    As a direct and proximate result of Defendants' criminal acts as described in this Count, Plaintiffs suffered injury and damages, for which Plaintiffs are entitled to recover pursuant to R.C. § 2307.60(A)(1).

302.    Defendants' misconduct alleged is ongoing and persistent.

303.    Defendants' misconduct is not a discrete event.

304.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights of other persons.

305.    Defendants also acted with aggravated and/or egregious fraud in committing their actions.

306.    Defendants fraudulent wrongdoing was also gross, malicious, and wanton.

307.    Defendants' actions caused substantial harm to Plaintiffs.

308.    Plaintiffs seek all legal relief to which they may be entitled pursuant to R.C. §§ 2307.60(A)(1) and 2307.61, including *inter alia* compensatory damages, punitive, liquidated and/or exemplary damages, attorney's fees, and the costs and expenses of suit, including pre- and post-judgment interest.

### FOURTEENTH CLAIM FOR RELIEF
### Theft Under R.C. §§ 2307.60, 2307.61, 2913.02, 2913.04,
### (Against All Defendants)

309.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

310.    Defendants purposefully deprived Plaintiff of Plaintiff's property. Defendants did so while knowingly obtaining and/or exerting control over plaintiff's property without Plaintiff's consent and/or acting beyond the scope of express or implied consent of Plaintiff.

311.    Defendants knowingly used Plaintiff's property without the consent of Plaintiff.

312.    Defendants knowingly gained access to, attempted to gain access to, or caused access to be gained to any computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service without the consent of, or beyond the scope of the express or implied consent of, Plaintiff, as the owner of the computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service or other person authorized to give consent.

313.    Plaintiff was harmed by Defendants' theft.

314.    Plaintiffs seek all legal relief to which they may be entitled pursuant to R.C. §§ 2307.60(A)(1) and 2307.61, including *inter alia* three times the value of the property at issue, compensatory damages, punitive, liquidated and/or exemplary damages and attorney's fees, and the costs and expenses of suit, including pre- and post-judgment interest.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter an order of judgment granting all relief requested in this complaint, and/or allowed at law or in equity, including:

a.  actual damages;

b.  treble or multiple damages and civil penalties as allowed by statute;

c.  punitive damages;

d.  exemplary damages;

e.  disgorgement of unjust enrichment;

f.  equitable and injunctive relief;

g.  forfeiture, disgorgement, restitution and/or divestiture of proceeds and assets;

h.  attorneys' fees;

i.  costs and expenses of suit;

j.  pre- and post-judgment interest; and

k.  such other and further relief as this Court deems appropriate.

**RESPECTFULLY SUBMITTED**,

/s/ *David J. Butler*
David J. Butler (0068455), Trial Attorney
Amy D. Vogel (0075169)
TAFT STETTINIUS & HOLLISTER LLP
41 S. High Street, Suite 1800
Columbus, Ohio 43215-4213
Phone: (614) 221-2838
Fax: (614) 221-2007
dbutler@taftlaw.com
avogel@taftlaw.com

and

Ellis Bennett (*pro hac vice application
forthcoming)*
David Trinnes (*pro hac vice application
forthcoming*)
Michael Shafer (*pro hac vice application
forthcoming*)
DUNLAP BENNETT & LUDWIG
211 Church St. SE
Leesburg, VA 20175
Phone: (703) 777-7319

ebennett@dbllawyers.com
dtrinnes@dbllawyers.com
mshafer@dbllawyers.com

*Counsel for Plaintiffs*